ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
shawnw@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
bcochran@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INTEL CORPORATION, LIP-BU TAN, and DAVID ZINSNER,<br><br>Defendants. | Case No. 5:26-cv-13758<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff City of Southfield Fire and Police Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Intel Corporation ("Intel" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Intel common stock between July 23, 2026 and October 29, 2026, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against Intel and certain of the Company's directors and executive officers.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because certain of the events or omissions giving rise to the claim occurred in this District, including the dissemination of the statements alleged to be materially false and misleading into and from this District. Intel is also headquartered in this District.

4. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

5. Plaintiff City of Southfield Fire and Police Retirement System, as set forth in the certification attached hereto and incorporated by reference herein, purchased Intel common stock during the Class Period and has been damaged thereby.

6. Defendant Intel Corporation is a multinational technology company headquartered in Santa Clara, California. Intel common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "INTC."

7. Defendant Lip-Bu Tan ("Tan") served as Intel's Chief Executive Officer ("CEO") and on Intel's Board of Directors during the Class Period.

8. Defendant David Zinsner ("Zinsner") served as Intel's Executive Vice President and Chief Financial Officer during the Class Period.

9. Defendants Tan and Zinsner are collectively referred to herein as the "Individual Defendants."

10. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, customers, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, customers, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Intel common stock

would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

13. Intel is a global designer and manufacturer of semiconductor and other computer component products, such as central processing units ("CPUs") and other microprocessors. The CPUs and other semiconductor solutions that Intel sells are incorporated into computing related end products and services. The Company's customers include original equipment manufacturers ("OEMs"), original design manufacturers, cloud service providers, and other industrial or commercial manufacturers. The Company markets and sells its products through a combination of direct sales and indirect channels, including distributors, resellers, retailers, and OEM partners.

14. In the time leading up to the Class Period, Intel maintained two business divisions: (i) Intel Products, which consisted primarily of Intel's CPU and related product sales; and (ii) Foundry, which consisted of Intel's tailored semiconductor process technologies and packaging solutions. Intel further divided its Intel Products division into the Client Computer Group ("CCG") operating segment and the Data Center and Artificial Intelligence ("DCAI") operating segment. Intel's CCG segment included the sale of platforms and processors that power personal computers ("PCs") and edge computing devices to various distributors and OEMs. Intel's DCAI segment

included the development and sale of the server CPUs, graphics processing units ("GPUs"), and network components used in AI data centers and other applications.

15. CCG has historically been Intel's largest and most profitable operating segment, accounting for approximately half of the Company's revenue and most of its profits. For fiscal year 2025, Intel's CCG segment generated $32.2 billion in revenue, compared to $16.9 billion in revenue for DCAI and $17.8 billion in revenue for Foundry. The Company's CCG segment also boasted a 29% operating margin for the year, compared to a 20% operating margin for DCAI and a 58% operating loss for Foundry.

16. The success of Intel's critical CCG segment is directly correlated with end user demand for PCs, such as desktop and notebook computers. Intel supplies microprocessors for most manufacturers of computer systems and was one of the primary developers of the foundational x86 series of instruction sets found in most PCs. The Company's Intel Core line of CPUs and Intel Arc series of GPUs are ubiquitous in general-purpose and gaming PCs.

17. Intel's business is ordinarily seasonal, with its net revenue higher in the second half of the year as compared to the first half of the year. Intel's net revenue usually accelerates in the third quarter and peaks in the fourth quarter as Intel's net revenue tracks annual PC product cycles.

18. Intel sells its microprocessors and platforms to distributors and other OEMs which then use the Intel products in the manufacture of end PCs sold to consumers, institutions, and commercial businesses. As a result, the Company and its executives closely track PC demand, and Intel generally has advanced awareness of expected performance in its CCG segment based on current PC market conditions and the health of the PC inventories at its distribution and OEM partners.

19. Prior to the start of the Class Period, Intel claimed to be experiencing a surge in demand for its CPUs as a result of a boom in the construction of the data centers used to service the artificial intelligence ("AI") industry, which relies on massive computational power to train and run AI systems. According to U.S. Census Bureau statistics, data center construction spending was on an annual pace to exceed $75 billion as of July 2026, nearly 60% above the pace of such

spending a year prior. As of mid-2026, more than 110 data centers providing 100 megawatts of power or more were under construction in the United States.

20. On January 22, 2026, Intel's CEO, defendant Tan, portrayed Intel as poised to take advantage of the AI buildout during the Company's fourth fiscal quarter of 2025 earnings call. Defendant Tan claimed that Intel was positioned to capture "unprecedented demand" for its products as a result of AI-related infrastructure projects, stating:

> The opportunity in front of us is meaningful and significant. The era of artificial intelligence is driving unprecedented demand for semiconductor across the entire compute landscapes from AI accelerated and traditional data centers into the network and enterprise domains all the way out to client and edge devices. Rapid deployment of AI workloads across this diverse environment will require heterogeneous silicon solution, leveraging CPU, embedded NPUs discrete and integrated GPU, ASICs and XPUs.
>
> * * *
>
> Looking ahead for 2026. We will continue to position Intel to capture the significant growth opportunity AI presents across all our businesses. We will do this by strengthening our client franchise, advancing our data center, AI accelerator and ASICs strategies and continue to build trusted US foundry.

21. Defendant Tan further claimed the AI opportunity was benefitting Intel's PC business, stating:

> In addition, PC become an important part of the AI infrastructure. The search in AI workloads is driving massive demand for data centers but cloud capacity alone cannot meet the scale of inference needed, especially in the power constrained environment. This accelerating the push toward hybrid AI splitting workloads between cloud and client which offers clear advantages in performance, cost and control. We are working closely with ecosystem partners to seamlessly enable hybrid AI, and we are encouraged by the opportunity to grow the installed base and accelerate the refresh rates over time.

22. On April 23, 2026, during Intel's first fiscal quarter of 2026 earnings call, defendant Tan again highlighted tremendous ostensible demand for the Company's products as a result of the AI infrastructure buildout, especially Intel's data center CPUs, stating:

> Even as we improve factory output, demand continues to run ahead of supply for all our businesses, especially for Xeon server CPUs, where we expect sustained momentum this year and next.
>
> * * *
>
> Intel is well positioned to benefit from this demand with three strategically important assets, our x86 CPU franchise, our advanced packaging technology and our vast manufacturing network. Artificial intelligence is now moving into the real

> world towards a more distributed inferenced and reinforced learning workloads, like agentic, physical AI, and robust and edge AI. This shift is now beginning to show up in our results, as I want to spend some time on this today.
>
> For the last few years, the story around high-performance computing was almost exclusively about GPU and other accelerators. In recent months, we have seen clear signs that the CPU is reinserting itself as the indispensable foundation of the AI era. CPU now serves as the orchestration layer and critical control plane for the entire AI stack. This is not just our wishful thinking.
>
> It is what we hear from our customers, and this is evident in the demand profile for our products. Xeon server demand is seeing strong and sustained momentum. Customers are deploying server CPUs along accelerators in the ratio that is moving back towards CPU.

23. During the call, defendant Zinsner emphasized the Company's $13.6 billion in first quarter revenue – $1.4 billion above the midpoint of Company guidance. Defendant Zinsner observed that Intel's "collective AI-driven businesses now represent 60% of revenue and grew 40% year over year."

24. To even more closely tie the fortunes of Intel's PC business to the AI buildout, in mid-2026, the Company renamed its critical CCG segment to its Client Computing and Physical AI Group ("CCPG") segment. As defendant Tan explained at the time: "We recently renamed our PC business to our client, computing, and physical AI group, or CCPG. We did this to recognize the growing opportunity for AI at the edge."

25. However, the AI boom has also led to supply constraints and inflationary pressures on the materials and inputs used in data center construction. Most notably, the price of memory storage components began rising rapidly in 2025, a pricing dynamic which continued into 2026. According to MemRadar, an industry online publication tracking memory storage prices, the median price for a 32 gigabyte DDR5 memory kit – a standard memory kit used in desktops and laptop computers – rose 372% between February 2025 and February 2026. These cost increases and supply constraints have in turn pushed PC prices higher.

26. Defendants acknowledged the rise in PC prices as a potential headwind to Intel's CCG segment as high prices may subdue end market PC demand. However, defendants claimed that these negative market effects were being counteracted by offsetting positive factors leading up to and during the Class Period, such as Intel's ability to raise prices and the need of Intel's

customers to replenish diminished inventory. For example, defendant Zinsner stated during Intel's first fiscal quarter of 2026 earnings call that Intel Products results would outperform end market PC demand due to positive offsets:

> Well, one thing you've got to kind of separate is when we talk about the industry, we're generally talking about consumption and when we're – obviously, that's different than our billings because of the inventory movements at customers. We are not going to be as impacted as the industry TAM, because we expect partly in terms of pricing a little bit, but also because of inventory replenishment at the customer level.
>
> So I think from a modeling perspective, whatever we get to in 2Q is probably what we run the rest of the year roughly. So it's going to be kind of flattish from Q2 onward from a revenue perspective, at least is how we're modeling it.

27. Defendants also claimed that Intel's overall performance, particularly growth in data center CPU sales, was counterbalancing weakening in PC demand and had placed Intel on track for CCG growth in 2026. For example, after noting the Company was "prudently planning for PC demand to weaken in the second half of the year," defendant Zinsner stated during Intel's first fiscal quarter of 2026 earnings call that both CCG and DCAI were on track to grow sequentially during Intel's second quarter:

> Offsetting this, near-term customer order patterns remain very robust across all of our businesses. In addition, our confidence in the sustained growth CPUs driven by the AI infrastructure build-out is growing. Our outlook for server CPU demand has improved over the last 90 days and we expect a strong year of double-digit unit growth for the industry and for us with momentum extending into 2027.
>
> Combining all of these factors, we're guiding Q2 revenue to a range of $13.8 billion to $14.8 billion, up 2% to 9% sequentially. As we work hard to support the need of all of our customers, we expect sequential revenue growth in both CCG and DCAI on improved supply and a full quarter of pricing actions, with DCAI, up double digits.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

28. The Class Period begins on July 23, 2026. On that date, Intel issued a press release reporting the Company's financial results for its second fiscal quarter ending June 27, 2026 ("2Q26 Release").[1] The release stated that Intel's second quarter revenue was $16.1 billion, up 25% year-over-year, and that the Company had earned $0.42 per share on a non-GAAP basis. The 2Q26

---

[1] Intel's fiscal year ends on the last Saturday in December of the calendar year.

Release also reported that Intel's CCPG segment posted $8.9 billion in revenue for the quarter, up 13% year-over-year.

29. Defendant Tan was quoted in the 2Q26 Release as touting AI-driven demand for Intel's products, stating: "'Our Q2 results represent our strongest revenue growth in more than fifteen years, enabled by greater speed, accountability, and customer focus.'" Defendant Tan added: "'AI is driving unprecedented demand for compute, and as we continue to execute, Intel is well-positioned to capture sustainable growth across our CPU franchise, ASICs, advanced packaging and vast wafer foundry network . . . .'"

30. Defendant Zinsner provided a similarly upbeat assessment of the Company's growth "across products" as a result of the AI boom, stating:

> "We delivered a strong second quarter, exceeding our financial guidance on robust demand and improved execution, including volume upside driven by higher factory yields and improved cycle times . . . . AI-driven compute continues to strengthen, and to support expected growth this year and next across products and foundry, we are meaningfully increasing our investments in equipment, clean room space, and substrates."

31. That same day, Intel held a conference call with analysts and investors to discuss the Company's financial and operational results for its second fiscal quarter of 2026, which was hosted by defendants Tan and Zinsner. During his prepared remarks, defendant Tan stated that "[t]oday," Intel was "seeing the strongest revenue growth in more than 15 years." Defendant Tan continued: "The surging demand and rapid buildout of compute infrastructure across the world creates a meaningful opportunity for us in our product business as well as our foundry business." Defendant Tan further stated: "Demand signals from our customers are driving increased confidence [and] we are substantially increasing our investments to support this improving demand outlook." Turning to Intel's "core PC client segment," defendant Tan stated: "Our factory output continues to increase sequentially every month."

32. Defendant Tan closed his prepared remarks by claiming that Intel was "well positioned to help define the next era of computing," further stating:

> Intel is uniquely positioned to benefit from the overwhelming demand for compute as the entire industry continue a rapid and sustained buildout of compute infrastructure. We are the only company that can design, manufacturing, build the entire range of computing solutions from general-purpose, traditional CPUs and

> GPUs to more purpose-built AIs and CPUs optimized for agentic AI as we increasingly move from compute dominant by system on chip towards system in package.

33. Defendant Zinsner used his prepared remarks to highlight the 15% sequential growth in Intel's CCPG results during the quarter, which had increased to $8.9 billion. Defendant Zinsner stated that: "The client's hand continued to hold up well despite broad component constraints and price inflation." Defendant Zinsner also focused on the purported success of the Company's Core Series 3 and Arc G-series in Intel's CCPG segment, as well as its AI PC products, representing that enterprise adoption of AI was expected to be "a long-term tailwind for CCPG."

34. Although defendant Zinsner reiterated the expected slowdown in end PC consumer markets previously highlighted by defendants, he stated that Intel was enjoying "some positive offsets" such as "improving supply, a strengthening product portfolio, and encouraging tailwinds for edge deployments."

35. Later, an analyst asked about defendants' claim that CCPG "demand [was] holding up pretty well" despite the overall PC market slowdown. The analyst inquired whether the strength in CCPG results was simply due to Intel increasing its prices and how those dynamics were expected to impact the second half of 2026.

36. In response, defendant Zinsner stated Intel's pricing power had indeed boosted segment results and that CCPG would "likely . . . be up" in the third quarter because of the need for Intel's customers to build inventory heading into yearend. Defendant Zinsner further stated that any fourth quarter softness would actually prove a positive for the Company as lower PC sales would allow Intel to reorient its production and alleviate supply constraints so as to meet explosive CPU data center demand that the Company was currently unable to fulfill. Defendant Zinsner stated:

> Yeah. I mean, client obviously exceeded expectations. I would say it was largely ASP, of which some of that was mix related. Some of that was our own like-for-like changes in ASPs, where we thought we had seen some inflation on our cost and needed to pass that on to the end customer.
>
> When you look at it year over year, it's definitely down that market. It had a really good 2025 because of the windows refresh. So it was coming off a little bit as it relates to that. And then, of course, memory in terms of cost and even availability, I think, has caused that market to be a little softer. But we just kind of

> skewed the mix to the higher end, and that helped a lot in terms of ASPs and helped it perform.
>
> I'd say as we look into next quarter, probably on a revenue basis, it's going to be kind of flattish for us. Overall, CCPG is likely to be up a bit, but I think it will be driven by good growth on the edge and client will be flattish. Underlying that, the market is softer. I mean, they are – I think that market is struggling with the memory dynamics in the marketplace. So we think it will be down in the quarter, but because they have been living relatively tight with inventory on CPUs, we likely would see some build in CPUs for Q3.
>
> And then Q4, I think we'll start to experience that in our own business and be soft. The good news for us is we need it because we need the CPUs for the data center side. We can't fulfill the demand as Lip-Bu was mentioning. So we'll pivot as much of the production as possible over to CPUs and data centers to try to do our best to catch up to what is a pretty significant difference between our ability to supply and the demand out there.

37. On July 24, 2026, Intel filed with the SEC its second fiscal quarter of 2026 financial results on Form 10-Q, which was signed by defendant Zinsner and certified by both Individual Defendants as to the report's material completeness and accuracy. The Form 10-Q contained and restated the quarterly financial results provided in the 2Q26 Release. In addition, the Form 10-Q stated that Intel revenue from notebook and desktop PC sales had grown more than $1 billion year-over-year during the quarter, primarily as a result of Intel-imposed price increases, and, although segment results had been negatively impacted by an inability to meet market demand due to supply constraints, these constraints were expected to "ease over the second half of 2026," stating:

> CCPG revenue increased $1.0 billion from Q2 2025 and $1.1 billion from YTD 2025. Client revenue (collectively notebook and desktop) was $7.7 billion in Q2 2026, up $1.1 billion from Q2 2025, and $14.3 billion in YTD 2026, up $1.2 billion from YTD 2025, primarily driven by ASP increases of 27% and 22%, respectively. The majority of the increase in ASPs was driven by a higher mix of premium products sold in Q2 2026 and YTD 2026, with demand-based pricing actions contributing to a lesser extent, in part to offset higher input costs. This increase in client revenue was partially offset by volume decreases of 8% compared to Q2 2025 and 10% compared to YTD 2025. Market demand exceeded our available product supply in Q2 2026 and YTD 2026 due to industry-wide supply constraints. While supply constraints impacted our results during the first half of 2026, we expect these constraints to ease over the second half of 2026.

38. The statements referenced in ¶¶28-38 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a) that the slowdown in PC end market sales was having a materially greater negative impact to Intel's third quarter 2026 CCPG results than defendants had disclosed to investors, negatively impacting CCPG margins and causing CCPG segment revenue to shrink by hundreds of millions of dollars sequentially, and that such negative impacts were expected to worsen for the foreseeable future;

(b) that Intel's OEM and distribution partners were suffering from a massive glut of unwanted PC inventory that they were unable to sell to end consumers because of the rise in PC component prices, lowering demand for Intel's PC-related products and materially impairing Intel's ability to offset lower CCPG volumes by imposing higher prices;

(c) that any positive impacts to Intel's business and financial results resulting from data center construction and other aspects of the AI boom were more than offset by the negative effects on the Company's business and financial results resulting from the PC market slowdown and the excess inventory buildup described in (a)-(b) above;

(d) that Intel suffered from substrate supply constraints such that the Company could not meaningfully ramp up production to meet data center CPU demand even if the Company chose to divert production resources as a result of a slowdown in PC-related sales; and

(e) that, as a result of (a)-(d) above, defendants' statements regarding Intel's business, operations, financial results, and ability to capitalize on the boom for AI-related infrastructure spending were materially false and misleading when made, and such statements did not accurately reflect Intel's then-present business and prospects.

39. Then, on October 29, 2026, Intel announced earnings for its third fiscal quarter ending September 26, 2026 ("3Q26 Release"), revealing a dramatic slowdown in its CCPG segment driving by depressed demand for PC sales. Rather than rising during the quarter, as portrayed by defendants, Intel's quarterly CCPG revenue came in at $8.1 billion, down 9%, or about $800 million, sequentially. Intel's Form 10-Q for the quarter later explained that the Company's "[c]lient revenue (collectively notebook and desktop) was $6.9 billion in Q3 2026, down $424 million from Q3 2025, driven by a 14% decrease in volume due to lower demand and a competitive market environment."

40. Even more surprising, the 3Q26 Release stated that Intel was on track for just $15 billion to $16 billion in total revenue during the fourth quarter, which represented a $1 billion sequential revenue slowdown at the midpoint during Intel's seasonally best quarter and which fell approximately $1.5 billion below consensus analyst estimates. The release also stated that Intel was on track to achieve only $0.25 non-GAAP earnings per share during the fourth quarter, 44% below consensus analyst estimates of $0.45 per share. Ominously, the release revealed that the PC slowdown was expected to continue "'at least through the first half of next year.'"

41. On October 29, 2026, Intel held a conference call with analysts and investors to discuss the Company's financial and operational results for its third fiscal quarter of 2026, which was hosted by defendants Tan and Zinsner. During the call, defendant Zinsner spoke about a PC "inventory correction." He continued: "We're in the throes of that right now. We felt a little bit of it in the third quarter. We're going to feel a lot of it in the fourth quarter."

42. When an analyst inquired whether the PC weakness would allow Intel to ramp up its data center business to meet robust AI-related demand, defendant Zinsner responded generally "yes," but cautioned that the Company would nonetheless remain resource constrained, notwithstanding defendants' prior statements to the contrary, as "we're not only constrained on the wafer side, we're also constrained on the substrate side. So it's important we get the substrate piece of this ramped up to be able to meet the demand."

43. Another analyst characterized the slowdown as the "worst" she'd seen "in at least 20 years," stating:

> I wanted to ask about PCs. Q3 was probably the worst Q3 I have seen for PCs in at least 20 years, maybe more sequentially. It does sound like customers probably built inventory in Q3, I guess. Can you confirm that?
>
> Then it sounds like that they are flushing out a bunch in Q4. I kind of get and maybe even in Q1. It sounds like you think things get better in the second half as, I suppose, memory supply improves. What gives you confidence that memory supply is actually going to improve? If you listen to memory, guys, they seem to be suggesting that it won't.

44. In response, defendant Zinsner confirmed:

> You are dead on that Q4, Q1 are going to be likely the two quarters in which there is most of the inventory correction, and that impacts us more than the TAM

> declines. So we will see that in the first, let us call it Q4, Q1, maybe stretching a little bit into Q2.
>
> After that, it does recover back to theoretically where billings to us are somewhat equivalent to consumption. So we get a little bit of a recovery from that. But make no mistake, we are not optimistic about next year in terms of memory.
>
> We think that it is going to impact the TAM. We think TAM will be down 10% on a units basis next year. Then we will have to see in 2028 whether things improve. But our expectation is that it does not improve in 2027.

45. Analysts slashed price targets, with several downgrading Intel common stock, on the negative surprise. In a research report, Morgan Stanley analysts observed: "The quarter was a setback, due to a surprisingly severe PC correction . . . . PC weakness drives most of the revision . . . with Intel forecasting record declines in 2h with lingering inventory dynamics into 1q." Similarly, Cantor analysts posted a note entitled: "Houston, We Have a Problem – Memory, Wafer and Substrate Shortages Drive Meaningful Reset to Numbers," which noted that "implied PC units -45% Y/Y was a meaningful surprise." *CNBC* analyst Jim Cramer, meanwhile, posted on X that he was "furious" about Intel's results, agreeing with his co-host during a *Squawk on the Street* morning segment that he and other Intel investors had not been "appropriately notified by the Company."

46. On this news, the price of Intel common stock fell from $92.07 per share on October 29, 2026 to $65.76 per share on October 30, 2026, a nearly 30% decline on above-average trading volume of more than 455 million shares traded. The decline was the largest single-day price decline for Intel common stock in over 50 years.

47. As a result of the declines in the price of Intel common stock after the revelations of truth detailed herein, Plaintiff and other members of the Class suffered significant financial losses and economic damages under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

48. Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Intel common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at

all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

49. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Intel common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Intel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

50. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

51. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

52. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether defendants' statements during the Class Period were materially false and misleading;

(b) whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c) the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

53. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ADDITIONAL SCIENTER ALLEGATIONS**

54. As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Intel, and their control over and/or receipt and/or modification of Intel's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

55. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. Accordingly, the fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

56. The Individual Defendants, because of their positions with Intel, controlled the contents of Intel's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the defendants is responsible for the accuracy of Intel's corporate statements and is, therefore, responsible and liable for the representations contained therein.

57. The demand environment for PCs and the inventory of Intel's OEM partners were among the most important issues facing the Company and the focus of Intel's management, including the Individual Defendants. The success of Intel's largest and most profitable segment, CCPG, was directly tied to end PC demand and the health of Intel's distribution and OEM partner inventories. The Individual Defendants held themselves out as the persons most knowledgeable regarding these issues. For example, defendant Zinsner told Intel investors during an earnings call that "[r]ising component pricing is a dynamic we continue to watch closely." Similarly, defendant Tan has stated that he listened to customer signals about "a PC slowdown based on the memory prices and availability."

58. Defendants also had the motive and opportunity to defraud investors. On August 12, 2026, defendants conducted a secondary public offering of Intel shares, selling over 240 million Intel shares at $95 per share for $23 billion in gross offering proceeds (including the exercise of the over-allotment option). Notably, this offering occurred halfway through Intel's disastrous third fiscal quarter of 2026. After the end of the Class Period, the price of the Intel common stock sold in the offering fell to less than $52 per share – 45% below the offering price less than three months prior.

**LOSS CAUSATION**

59. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Intel common stock and operated as a fraud or deceit on Class Period purchasers of Intel common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Intel common stock declined significantly as the prior artificial inflation came out of the price of the stock, as detailed herein. As result of their purchases of Intel common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICATION OF THE PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

60. At all relevant times, the market for Intel common stock was an efficient market for the following reasons, among others:

(a) Intel common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b) as a regulated issuer, Intel filed periodic public reports with the SEC;

(c) according to the Company's Form 10-Q for the quarterly period ended September 26, 2026, Intel had approximately 5.3 billion shares of common stock outstanding as of October 23, 2026;

(d) Intel regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e) unexpected material news about Intel was rapidly reflected in and incorporated into prices for Intel ordinary shares during the Class Period.

61. As a result of the foregoing, the market for Intel common stock promptly digested current information regarding Intel from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Intel common stock during the Class Period suffered similar injury through their purchases of Intel common stock at artificially inflated prices and a presumption of reliance applies.

62. A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions. Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

63. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Intel who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

64. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Intel common stock during the Class Period.

67. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Intel common stock. Plaintiff and the Class would not have purchased Intel common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

68. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Intel common stock during the Class Period.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

69. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70. During the Class Period, defendants acted as controlling persons of Intel within the meaning of §20(a) of the 1934 Act. By virtue of their positions and their power to control public statements about Intel, the Individual Defendants had the power and ability to control the actions of Intel and its employees. Intel controlled the Individual Defendants and all of its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: November 13, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)

s/ Shawn A. Williams
SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
shawnw@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com

VMT LAW, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
tmichaud@vmtlaw.com

Attorneys for Plaintiff

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

City of Southfield Fire and Police Retirement System ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*KaraEftimoglu v. Mader*, No. 2:25-cv-02530 (W.D. Wash.)
*City of Southfield Fire and Police Retirement System v. Cogent Communications Holdings, Inc.*, No. 1:26-cv-02609 (D.D.C.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of November, 2026.

City of Southfield Fire and Police
Retirement System

By: Megan Ballusko

Its: Retirement Program Director

INTEL

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/30/2026 | 21 | $91.13 |
| 08/12/2026 | 151 | $100.95 |
| 09/10/2026 | 10 | $100.32 |
| 09/18/2026 | 18 | $108.60 |
| 10/12/2026 | 17 | $101.44 |

Prices listed are rounded up to two decimal places.